AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Iowa

| | |
|---|---|
| United States of America<br>v.<br><br>VEMUNA KATJAIMO and<br>EMMANUEL AZUBUIKE OGBEIDE<br><br><br><br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  3:21-mj-65

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 2018 - July 31, 2019_____ in the county of _____Muscatine_____ in the

_____Southern_____ District of _____Iowa_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 1349 and 1956(h) | Conspiracy to Commit Wire Fraud, and<br>Conspiracy to Commit Money Laundering |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jeffrey S. Huber, Special Agent FBI
*Printed name and title*

☐ Sworn to before me and signed in my presence.

☑ Sworn to before me by telephone or other
reliable electronic means.

Date:  _____June 10, 2021_____

_____
*Judge's signature*

City and state:  _____Davenport, Iowa_____

U.S. Magistrate Judge Stephen B. Jackson, Jr.
*Printed name and title*

FILED
By: Clerk's Office, Southern District of Iowa
12:07 pm, Jun 10 2021

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

UNITED STATES OF AMERICA      )
                              ) ss
SOUTHERN DISTRICT OF IOWA     )

I, Jeffrey Huber, being duly sworn state and depose as follows:

## INTRODUCTION

1.      I am a special agent (SA) with the Federal Bureau of Investigation (FBI) and, as such, I am charged with enforcing all federal laws in all jurisdictions of the United States, its territories, and possessions.  I have been employed as an FBI SA since February 2002.  I am currently assigned to the Cyber Task Force of the Omaha Field Office, Quad Cities Resident Agency.  During my career as a Special Agent, I have investigated several criminal violations and have received additional training in the investigation of computer and financial related crimes.  I currently investigate cyber matters, which include computer-enabled criminal violations relating to computer enabled fraud designed to induce victims to wire money to criminally controlled bank accounts.  As a result of my training and experience, I am familiar with information technology and its use in criminal activities.  This affidavit is intended to show only that there is sufficient probable cause for the requested arrest warrants and does not set forth all of my knowledge about this matter.

2.      In BEC scams, the scammers target businesses and individuals making wire transfer payments. The scammers often target employees with access to company finances and trick those employees via email into making wire transfers to a bank account that scammers falsely represent as belonging to one of the company's trusted

1


FILED
By: Clerk's Office, Southern District of Iowa
12:08 pm, Jun 10 2021

vendors or partners—when in fact that account is controlled by the scammers and their associates. Additionally, BEC scammers sometimes use sophisticated computer intrusion techniques to alter legitimate payment-request emails, change the recipient bank account to an account controlled by the fraudsters, or obtain company information related to outstanding invoices and venders.

3.     One of the common methods BEC schemes employ is the use of "spoofed" email accounts. Spoofed email accounts are accounts that imitate the corporate email accounts of an employee of a vender to the victim company. These fake e-mail accounts are specifically designed to trick employees of the company to think the fake email accounts are authentic.  Fraudsters use those imitation accounts to direct employees, customers, or partners of a victim company to send money to a bank account controlled by the fraudster or a co-conspirator. Fraudsters often direct an employee, customer, or partner to wire funds under the disguise of legitimate business transactions, as in a payment to a vender. The fraudulent emails or computer intrusions described above, are sent via interstate wires and the money sent in response to the BEC scam is sent to bank accounts via interstate wires. Therefore, these scams are a violation of the Wire Fraud statute, Title 18, United States Code, Section 1343 and those working together to commit the scams are violating the Fraud Conspiracy statute, Title 18, United States Code, Section 1349.

4.     In order to collect the fraudulent proceeds, BEC fraudsters need bank accounts controlled by co-conspirators to collect the stolen money.  Therefore, prior to the scam, the co-conspirator opens a bank account under the name of a non-existent business

in order to conceal and disguise the nature, location, sources, ownership, and control of the proceeds of the fraud.  Further, after a BEC scam is successful, and the money is deposited into a co-conspirator's account, the co-conspirators act quickly to remove any fraudulent funds deposited into the accounts (s)he controlled.  The quick withdrawal of funds is also designed to conceal and disguise the nature, location, sources, ownership, and control of the proceeds of the fraud.  Therefore, these transactions are in violation of Money Laundering Statute, Title 18 U.S.C. Section 1956, and those working together to commit these transactions are participating in a Conspiracy to Commit Money Laundering, Title 18 U.S.C. Section 1956(h).

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to conclude that VEMUNA KATJAIMO and EMMANUEL AZUBUIKE OGBEIDE (hereinafter KATJAIMO and OGBEIDE) were involved in a Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code, Section 1349; and a Conspiracy to Commit Money Laundering in violation of Title, 18 United States Code § 1956(h).

6.     I am aware of the information set forth below through observations, discussions with other law enforcement officers, and the review of police reports, bank records, and other business records. The following contains some, but not all, of the information known by this affiant.

## FACTUAL BASIS

**Wire Fraud**

7.      The FBI has been investigating a successful Business Email Compromise (BEC)[1] that resulted in the transfer of $265,151.46 by the victim to a fraudulent bank account.   The victim of the BEC is a global engineering consulting firm, with its headquarters located in Muscatine, Iowa, which is within the Southern District of Iowa.   (hereinafter referred to as Company 1).   Company 1 uses an accounting software designed for engineering companies. Vender records are added using the accounting software. An ACH wire to pay a vender of Company 1 is first initiated using this software. There is a manual upload of the ACH file to Company 1's bank, Wells Fargo Bank, using the internet.   This is all done from Company 1's corporate headquarters in Muscatine, Iowa.   The computer servers for Company 1 are located at their headquarters in Muscatine, Iowa, and they send communications to Wells Fargo via interstate commerce to initiate the ACH payment.   Once received by Wells Fargo Bank, the ACH payments are sent to the Federal Reserve, via an electronic communication transmitted in interstate commerce, which then sends the payments to the recipient bank account also via an electronic communication transmitted in interstate commerce. The bank account that received the aforementioned funds from

---

[1] The term "Business Email Compromise" or BEC refers to a sophisticated scam targeting businesses and individuals that regularly perform wire transfers or automated clearing house (ACH) payments. A BEC scammer attempts to use email in order to defraud a business or individual of money.

Company 1, was fraudulent in that it was under the control of someone involved in the fraud, rather than the entity to whom Company 1 intended to transfer the money.

8.      On or about May 24, 2019, an employee (hereinafter referred to as employee 1) who worked for Company 1 received an email communication transmitted in interstate commerce that purported to be from an email address associated with an employee for Company 2, a vender of Company 1.   Company 2 is located in San Antonio, Texas.   The email concerned the status of open invoices that pertained to a specific job number and name.   The email included the correct dollar amounts and invoice numbers that pertained to the referenced job.   The sender of the email used the email address of kbeckman@rkcigroup.com, but unbeknownst to Company 1, the email address was not affiliated with Company 2.   Employee 1 replied with an out-of-office response, which included instructions to contact other employees in his/her absence.

9.      On or about May 24, 2019, a few minutes after the first email was received by Company 1, an employee (hereinafter referred to as employee 2) at Company 1 received a similarly worded email communication transmitted in interstate commerce from email address kbeckman@rkcigroup.com and forwarded the email to the Company 1 project manager requesting permission to respond to the request.

10.      On or about May 24, 2019, employee 2 working for Company 1 replied to the email received by kbeckman@rkcigroup.com and said that Company 1 was waiting for payment from their client and once payment was received, Company 2 would be

paid.   Within twenty minutes of receiving the email from employee 2, kbeckman@rkcigroup.com responded   via an email communication transmitted in interstate commerce and advised that Company 2's banking information changed. The emailed further asked employee 2 for a form to update the banking information that Company 1 had on file.   Based on this request, employee 2 provided kbeckman@rkcigoup.com with an ACH form to fill out and send to another employee (hereinafter referred to as employee 3) at Company 1.

11.     On or about May 24, 2019, kbeckman@rkcigroup.com responded via an email communication transmitted in interstate commerce with the completed form, sending it to employee 3 and copying employee 2 on the response.

12.     On or about May 29, 2019, employee 2 for Company 1 received an email communication transmitted via interstate commerce from the spoofed email address of kbeckman@rkcigroup.com that asked for an update on the banking change.

13.     On or about May 29, 2019, Company 1 changed the bank information on file for Company 2 to a BBVA COMPASS BANK account ending in x3975, located in Richardson, Texas based on the materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts made via email communication transmitted in interstate commerce.

14.     On or about May 30, 2019, Company 1 sent an ACH payment via wire communication transmitted in interstate commerce in the amount of $131,719.65

from their Wells Fargo bank account in Muscatine, Iowa, to the BBVA COMPASS BANK account ending in x3975 located in Richardson, Texas.

15.     During the month of June 2019, a series of emails are exchanged between employee 2 and employee 3 at Company 1 and the person purporting to be the employee at Company 2 using the email address of kbeckman@rkcigroup.com.  The emails pertained to the payment of another invoice.   These were email communications transmitted via interstate commerce.

16.     On or about July 3, 2019, Company 1 used the process set forth in paragraph seven to send an ACH payment via wire communication transmitted in interstate commerce in the amount of $133,431.81 from their Wells Fargo bank account in Muscatine, Iowa, to the BBVA COMPASS BANK account ending in x3975 located in Richardson, Texas.

17.     On or about July 12, 2019, employee 2 at Company 1 received an email and a voicemail from an employee at Company 2 that inquired about the lack of payment received from Company 1 on certain invoices.  On or about July 16, 2019, Company 1 and Company 2 realized they had been caught in the middle of a fraud and payments were fraudulently misdirected to a bank account not associated with Company 2.

18.     Subsequent investigation by Company 1 determined that starting on or about May 24, 2019, the emails received by Company 1 that purported to be from an employee at Company 2, were actually from an unknown subject who used the

spoofed[2] email address of kbeckman@rkcigroup.com which appeared to be similar to kbeckman@rkci.com, the real email address of Company 2's actual employee.   The spoofed email address included the extra word "group" at the end of the email address.

**The Investigation**

19.     After the fraud was discovered, the FBI began an investigation, which revealed that BBVA COMPASS BANK account ending in x3975 was owned by Bryant Brothers Construction, controlled by KATJAIMO, and held in Richardson, Texas. Bank account records for this account were examined.  This bank account was opened on in February 2019 by KATJAIMO.  In reviewing the bank statements, there was no construction business activity from this account.  There was no evidence to show the purchase of building materials or other business supplies, nor was there any evidence to show KATJAIMO paid construction venders.  However, on May 28, 2019, a noteworthy cashier's check of $65,500 made out to Bryant Brothers Construction was deposited into the account.  KATJAIMO was the remitter on this check.

20.     Investigation into the $65,500 revealed that these funds originated from Comerica account ending in x9768 held in the name of Service One Construction, and under the control of KATJAIMO.  This account was opened by KATJAIMO on March

---

[2] A spoofed email is one in which the sender, in this case a participant in the fraud, alters parts of an email address in order to make it look as though it were written by someone else.

26, 2019, with $100 in cash.  The bank statement activity for the Comerica account was reviewed, and there was no construction business activity shown in this account. There was no evidence to show the purchase of building materials or other business supplies, nor was there any evidence to show this account paid construction venders.

21.     The bank statements from the Comerica account detailed an ACH wire that was received on May 24, 2019, from Company 3 in the amount of $88,609.  The day after these funds were deposited, KATJAIMO wrote the $65,500 check out of this account to Bryant Brothers Construction with a memo line that read "construction equipments."  These funds were then deposited into the BBVA COMPASS BANK account that received Company 1's ACH wire.

22.     Company 3 was contacted.  It was learned that on or about April 29, 2019, the general accounts payable email address for Company 3 received an email that purported to be from an email address associated with an accountant for Company 4, a vender of Company 3.  The vender has several locations, including Hutchins, Texas. The email concerned the status of three open invoices, and it included invoice numbers, due dates, and amounts.  The sender of the email used the email address of wbrandon@signicastllc.com, but unbeknownst to Company 3 the email address was not affiliated with their vender.

23.     On or about April 29, 2019, the general accounts payable email address for Company 3 received another email that purported to be from an email address associated with the same accountant for the vender.  The email advised that the

vender's banking details changed, and it requested a new direct deposit authorization form.  On or about April 30, 2019, Company 3 received an email from the email address of wbrandon@signicastllc.com that provided a completed direct deposit authorization form.  The form listed Comerica Bank account ending in x9768, located in Richardson, Texas, as the vender's new bank account.

24.     On or about May 23, 2019, Company 3 sent a wire transfer payment in the amount of $88,608 to the Comerica Bank account ending in x9768.

25.     On or about July 1, 2019, Company 3 became aware they were the victim of a fraud after being contacted by their vender in reference to non-payment.

26.     Subsequent investigation by Company 3 determined that starting on or about April 29, 2019, the emails received by Company 3 that purported to be from an accountant of the vender, were actually from an unknown subject using the spoofed email address of wbrandon@signicastllc.com which appeared to be similar to wbrandon@signicast.com, the real email address of the vender's actual employee.  The spoofed email address included the extra letters "llc" at the end of the email address.

27.     Additional deposits into the Comerica account were investigated.  On or about March 28, 2019, a $88,750 cashier's check from a Bank of Oklahoma account owned by KATJAIMO was deposited into the account.  The funds from this cashier's check have been traced back to a different BEC fraud similar to that perpetrated on Company 1.

28.     On July 3, 2019, KATJAIMO'S Comerica account received a wire in the amount of $43,398 from Company 5.  It was determined that these funds were also acquired through a BEC scheme similar to that utilized to obtain the wires from Company 1 and Company 3.

29.     All of the ACH payments that were deposited into to KATJAIMO'S bank accounts, including those remitted by Company 1, utilized wire communications in interstate commerce to transmit the funds between the banks.

30.     Due to the suspicious activity in the Comerica account, it was frozen by the financial institution.  On July 5, 2019, KAJAIMO called into the bank and inquired into why her debit card would not work.  KATJAIMO spoke with a fraud investigator, who questioned KATJAIMO about the $88,608 wire into her account.

31.     KATJAIMO told the investigator that the deposit related to her construction company. KATJAIMO claimed she did not have all the paperwork in front of her. The investigator asked about the large check to Bryant Brothers Construction. KATJAIMO said that was also her construction company. KATJAIMO told the investigator that the vender she dealt with used the same bank as the Bryant Brothers bank, which is why she transferred the money. When asked for a general idea of what she did to receive the $88,608 payment from Company 3, KATJAIMO said she sold some building materials for construction. KATJAIMO claimed to not remember who she sold the building materials to because she didn't have the paperwork in front of her.

32.     The investigator then asked KATJAIMO about a wire she received on July 3, 2019, in the amount of $43,398 from Company 5. KATJAIMO said the wire related to electrical work they were going to be doing to assist a company they work with. When asked about the wire having another company name listed as the intended beneficiary (Company 6), KATJAIMO told the Comerica bank investigator she subcontracted the work out to Company 6. KATJAIMO claimed the wire was sent to her and not Company 6 because she was the one with the business account and the contract with Company 5.

**Money Laundering**

33.     After KATJAIMO received the money from Company 1, bank records showed that she worked with OGBEIDE, and other conspirators both known and unknown, to quickly to remove the money from the account with the purpose of concealing and disguising, the nature, location, source, ownership, and control of the proceeds obtained through the wire fraud.  This activity includes, but is not limited to the following transactions:

A.     On May 31, 2019, KATJAIMO, obtained cashier's check 504058513 in the amount of $79,500 payable to OGBEIDE, and drawn on BBVA Compass bank account ending in x3975.  On this same date, KATJAIMO, obtained cashier's check 504058512 in the amount of $21,000 payable to herself, and drawn on BBVA Compass bank account ending in x3975.  Surveillance video was obtained from the bank on this date, and it shows KATJAIMO inside the

bank conducting a transaction. On this same date, OGBEIDE, deposited this cashier's check into his personal Capital One checking account ending in x8725. The records from the Capital One account show that OGBEIDE received regular payroll direct deposits from his known employer into this account.

B.      On June 1, 2019, KATJAIMO, obtained cashier's check 504149266 in the amount of $20,000 payable to OGBEIDE, and drawn on BBVA Compass bank account ending in x3975. On this same date, KATJAIMO, obtained cashier's check 504149265 in the amount of $20,000 payable to herself, and drawn on BBVA Compass bank account ending in x3975. Surveillance video was obtained from the bank on this date, and it shows KATJAIMO inside the bank conducting a transaction.

C.      On June 7, 2019, OGBEIDE, deposited cashier's check 504149266 into his personal Capital One checking account ending in x8725.

D.      On July 6, 2019, KATJAIMO, obtained cashier's check 504825070 in the amount of $39,600 payable to OGBEIDE, and drawn on BBVA Compass bank account ending in x3975. Surveillance video was obtained from the bank on this date, and it shows KATJAIMO inside the bank conducting a transaction. On this same date, OGBEIDE, deposited this cashier's check into his personal Capital One checking account ending in x8725.

34.    Based on my training and experience, it is common for individuals involved in wire fraud and money laundering to open, or cause to be opened, business bank

accounts in order receive fraudulent BEC funds.  This is done because when a large transfer of money is received into a business account, it is less suspicious than if the money was deposited into a personal bank account.  This is because businesses frequently utilize wire transfers to move large sums of money for business related reasons as opposed to individuals who do not send or receive large sums of money on a regular basis.  In this way, those who participate in the fraud, try to make the funds look legitimate, thus concealing and disguising them as a business transaction. Further, once the funds are received, the co-conspirators work quickly to remove the money from the receiving bank account using different methods, including, but not limited to, checks, money orders, cashier's checks, mobile payment application payments, cash withdrawals, and the like.  This further serves to conceal and disguise the nature and source of the funds.

35.    Based in part on the transactions described above, investigators obtained bank records related to accounts owned by OGBEIDE.  A review of these records determined that OGBEIDE participated in receiving other BEC money from KATJAIMO and other money mules.

36.    Some of the notable activity will be set forth in this affidavit for the purpose of providing probable cause, however the information contained herein does not include many significant fraudulent transactions contained in OGBEIDE'S financial records.

    A.    On August 23, 2018, a check in the amount of $39,850 was deposited into a JP Morgan Chase account in the name of EMMANUEL OGBEIDE, DBA

14

Reliable Transports ending in x8162.  The check was from a business account controlled by Conspirator 1. Investigation revealed that this account was opened on July 26, 2018, with a $100 deposit.  On August 22, 2018, the account received a wire in the amount of $50,000.  An interview of the business that sent these funds revealed that the funds were not intended for Conspirator 1 or her business but were diverted into the account by way of a BEC fraud.  The BEC scheme was similar to that utilized on Company 1, in that a spoofed email account purporting to be from a business client was sent to the fraud victim company to induce them to change the banking information they had on file.   The business account that received this wire and issued the check to OGBEIDE was closed due to fraud.   Records from the JP Morgan Chase account ending in x8162 show that an IP address associated with OGBEIDE'S known residence was used to log into this account.

B.     On December 26, 2018, an ACH wire in the amount of $500,000 was received into OGBEIDE'S JPMorgan Reliable Transports bank account ending in x8162.  The wire was from a business account controlled by Conspirator 2, which was opened on December 3, 2018. On December 21, 2018, this account received a wire in the amount of $2,338,672.05.  An interview of the business that sent these funds revealed that the funds were not intended for Conspirator 2 or her business but were diverted into the account by way of a BEC fraud.  The BEC scheme was similar to that utilized on Company 1 in that a spoofed email account purporting to be from a contractor doing business

with the victim company was sent to trick the victim company into changing the banking information they had on file.  The business account that received this wire and issued the funds to OGBEIDE was closed due to fraud.

C.     On January 8, 2019, Bank of America account ending in x3685 received a $38,914.38 interstate wire that was procured from a BEC scheme similar that used on Company 1.  Account ending in x3685 is held in the name of Bryant Brothers Construction and KATJAIMO is the authorized signer.  On January 14, 2019, KAJAIMO wrote a check to OGBEIDE in the amount of $23,500 with "payment for vehicle" written in the memo line.  OGBEIDE deposited this check into his personal Capital One bank account ending in x8725.

D.     On January 31, 2019, a M&T account in the name of KATJAIMO received a $23,154.11 interstate wire that was obtained as part of a BEC scheme similar to the one used on Company 1. After this money was received, KATJAIMO transferred the majority of it by way of money order. Between the dates of January 31, 2019 and February 4, 2019, she purchased approximately $15,069.56 in money orders at two different locations.  Approximately $10,250 in money orders were deposited into OGBEIDE'S Capital One checking account ending in x8725 during this same time.

E.    On July 3, 2019, OGBEIDE deposited a $17,000 check into his Capital One checking account ending in x8725.  The check was from a business account controlled by Conspirator 3.  Investigation revealed that this account had a negative balance until it received a wire in the amount of $36,226.  An interview with the business that sent these funds revealed that the funds were not intended  for Conspirator 3 or his business but were diverted into the account by way of a BEC fraud similar to that utilized on Company 1.  The business account that issued this check was closed due to fraud.

36.    Records were obtained from the Square, Inc. accounts that belong to KATJAIMO and OGBEIDE.  Square, Inc. allows users to send and receive money for free through a mobile application.  Examination of KATJAIMO'S Square, Inc. records from January 1, 2019 through July 31, 2019, show KATJAIMO regularly made payments to OBGEIDE utilizing this service, and OBGEIDE was the individual to whom she directed the most money.  Examination of OGBEIDE'S Square, Inc. records show that he regularly received payments from KATJAIMO, and she was the individual who sent him the most money. Further, KATJAIMO and OGBEIDE made payments to, or received payments from, at least three common individuals.

37.    In addition to detailing the transactions made and received by the user, Square, Inc. also keeps records on the IP addresses that are used to log into the accounts.  The data for the accounts of KATJAIMO and OGBEIDE show that there were multiple occasions where they conducted Square, Inc. transactions on the same

days using the same IP address, which was 172.125.137.213.   Based on records received from AT&T, the subscriber associated with IP Address 172.125.137.213 is OGBEIDE and the property address provided to AT&T for OGBEIDE is associated with a known residence for KATJAIMO.

38.   From April 2019 through July 2019, bank account records obtained for KATJAIMO and OGBEIDE show that they sent or received money from at least two of the same individuals.   These two individuals were the owners of business bank accounts that received BEC funds.   One of these individuals received money from KATJAIMO one day after the receipt of funds from Company 1 on July 5, 2019.

39.   At least ten different bank accounts have been identified as belonging to KATJAIMO.   For seven of those accounts she provided a phone number ending in 3537.   OGBEIDE provided a phone number ending in 0014 on his Capital One bank account documents, and on his resume. Call detail records were obtained for KATJAIMO'S number ending in 3537 from January 1, 2019 to July 29, 2019.   There are over 225 contacts or attempted contacts (phone calls, text messages) between KATJAIMO and OGBEIDE.   Some of the phone calls between them are over twenty minutes in length and there are a few phone calls that are almost two hours in length.

40.   On eight of the bank accounts owned by KATJAIMO, she provided an address of 110 Cityline Drive, which is an apartment complex. A review of KATJAIMO'S bank records shows that on June 3, 2019, she obtained a cashier's check in the amount of $4,560 to Axis 110 from the BBVA bank account that received the money from

Company 1. The records received from the apartment complex on Cityline Drive, show that on June 3, 2019, a check was received by them for payment of rent for apartment 1074 in the amount of $4,560. Two different employees of this apartment complex have been interviewed, and they identified KATJAIMO as one of the tenants in unit 1074. This apartment was rented by Kevin Curry. Investigation by the FBI could not verify that Curry is a real person. The lease for this apartment was submitted using IP address 66.25.444.208. This IP address is owned by Charter Communications, who had it assigned to the known residence of OGBEIDE at the time the lease was submitted. This IP address was also used to log into OGBEIDE'S financial accounts, to include World Remit, a cross-border money payment service.

41. Records were received for OGBEIDE'S World Remit account between March 2018 and March 2019. This account was closed due to suspected fraud. During the time frame that it was open, OGBEIDE regularly sent money to various individuals in Nigeria. Further review of these records showed that there were multiple occasions where OGBEIDE sent money on consecutive days to the same recipient totaling less than the daily limit. The fees incurred by this transaction pattern are greater than that assessed to one, larger transaction. Based on the affiant's training and experience, it is common for BEC scams to have co-conspirators based in Nigeria, therefore it is common for a percentage of the money procured by these schemes to be sent to these co-conspirators. In addition, multiple, small transactions to these individuals is common as this method is one way to prevent the discovery of the illegal source of the funds because it avoids the attention of larger transactions.

19

## CONCLUSION

42.    The Defendants, VEMUNA KATJAIMO and EMMANUEL AZUBUIKE OGBEIDE, together with others known and unknown, voluntarily entered into an agreement to execute and attempt to execute a scheme to defraud victims as to material matters, and to obtain money and property from such victim by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts; and in furtherance of that scheme used interstate wire communications.

43.    Further, VEMUNA KATJAIMO and EMMANUEL AZUBUIKE OGBEIDE knowingly participated in, and conducted, financial transactions affecting interstate and foreign commerce that involved the proceeds from these BEC scams that were procured via wire fraud, including the funds that were obtained from Company 1. When they engaged in these financial transactions, they knew that the property involved represented the proceeds of some unlawful activity, and they conducted the financial transactions, knowing that they were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of wire fraud.

37.    Based on the foregoing, there is probable cause to charge VEMUNA KATJAIMO and EMMANUEL AZUBUIKE OGBEIDE  with Conspiracy to Commit Wire Fraud, in violation of Title 18 United States Code, Section 1349 and Conspiracy

to Commit Money Laundering, in violation of Title 18, United States Code, Section

1956(h).


_____

Jeffrey S. Huber
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed to before me by telephone or other reliable electronic means this __10__ day of June 2021.


_____

Judge Stephen B. Jackson Jr.
United States Magistrate Judge
Southern District of Iowa

21